19-MJ-7257-JCB
19-MJ-7258-JCB

## AFFIDAVIT OF JAMES KECZKEMETHY IN SUPPORT OF SEARCH WARRANT, COMPLAINT, AND ARREST WARRANT

I, Special Agent James Keczkemethy, being duly sworn, depose and state that:

1.      I am a Special Agent employed by the Drug Enforcement Administration ("DEA"), and have been so employed since May 11, 2018. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United Stated Code. Prior to my employment with DEA, I was a Police Officer in Hartford, Connecticut for over six years and was responsible for enforcing State of Connecticut motor vehicle and criminal laws; including but not limited to, narcotic violations.

2.      During my law enforcement career I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Section 841(a)(1). Many of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles and the forfeiture of personal property. My investigations have included the use of surveillance techniques, tracking warrants, and the execution of search, seizure and arrest warrants. I have participated in various aspects of narcotics investigations, including controlled and undercover purchases. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances.

3.      As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in the use, sale, and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, and dispense, import and export, and use controlled substances such as methamphetamine, fentanyl, heroin, cocaine, marijuana, prescription medications, and others. I have debriefed numerous defendants, informants, and witnesses who have had personal knowledge about drug activities and

the operation of drug trafficking organizations.  I have sworn out numerous affidavits in support of search warrants, arrest warrants, and other Court applications.

## PURPOSE OF THE AFFIDAVIT

4.      I am submitting this affidavit in support of:

    a.  A criminal complaint charging Erick Alberto Paulino AMADOR, a/k/a "FLACO," with distribution of and possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), on July 25, 2019, further described below.

    b.  An application for the issuance of a search warrant for 34 Melrose Street in Lawrence, MA 01841 ("Target Location").  A complete description of Target Location is set forth in Attachment A, which is attached hereto and incorporated herein.

5.      I am familiar with the facts and circumstances of this investigation from my own participation and from oral reports made to me by agents of federal, state, and local law enforcement agencies.

6.      This affidavit is submitted for the limited purpose of establishing probable cause to believe that AMADOR has committed the above offense and that, at the Target Location described in Attachment A, there exist evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances).  Accordingly, I have not included each and every fact

known to me and other law enforcement officers involved in this investigation.  I have set forth

only the facts that I believe are needed to establish the requisite probable cause.

### EVIDENCE IN SUPPORT OF PROBABLE CAUSE

7.      On two occasions, first on July 16, 2019 and again on July 25, 2019, AMADOR

sold suspected fentanyl to an undercover police officer ("UC").

#### July 16, 2019: AMADOR sold suspected fentanyl to an undercover officer

8.      On July 16, 2019, a confidential informant ("CI") under direction of the UC,

initiated a phone call to an individual known as "FLACO" (FLACO was later identified as

AMADOR, and will be referred to as AMADOR throughout this affidavit).  The CI called the

telephone number 332-201-8354 and arranged for the purchase of heroin or fentanyl from

AMADOR for a price of $200.[1]

9.      During that conversation, AMADOR told the CI to go to Myrtle Street in

Lawrence, MA.  The CI, in turn, told AMADOR that he/she would introduce AMADOR to a

new customer.

10.     A DEA Task Force Officer ("TFO") searched the CI for any money and

contraband and found none.  The TFO provided the UC with $200.00 in serialized Official

Advanced Funds ("OAF") and the UC was equipped with a voice transmitter/recorder.

11.     Together with the CI, the UC traveled to Myrtle Street in Lawrence, MA.  The CI

left the UC's vehicle to find AMADOR.  The CI returned and instructed the UC to drive to the

Myrtle Street and Alma Street.  After arriving at the intersection of Myrtle Street and Alma

---

[1] The CI is cooperating after being caught buying drugs.  The CI has prior arrests for offenses including
larceny, drug-related charges, and assault and battery.  The CI has open cases.  In light of the fact that information
he/she provided regarding AMADOR's cellular phone number and drug dealing activity has been corroborated, and
based on my experience, I believe the CI to be a reliable source of information regarding AMADOR.

Street, a dark skinned Hispanic male, with curly hair, wearing a baseball hat, gray t-shirt, acid washed jean shorts, and sneakers approached the car. This man was identified as AMADOR.

12.     AMADOR entered the rear passenger seat of the UC's car. The CI introduced AMADOR and the UC. The UC handed AMADOR $200.00 in serialized Official Advanced Funds ("OAF"). AMADOR counted the money and then handed the UC a clear plastic bag tied in a knot containing an off-white powdery substance. The UC has over 20 years of law enforcement experience, 19 of which have been working directly in narcotics enforcement. Over the past 19 years, he has conducted hundreds of undercover operations. For the past four years, he has worked for the DEA as a Task Force Officer. As a narcotics enforcement officer, he is familiar with the appearance, packaging, and texture of many controlled substances, including fentanyl. Based upon his training and experience, the packaging, appearance, and pricing, the UC identified the substance as fentanyl.

13.     AMADOR told the UC to obtain AMADOR's cellular phone number from the CI and exited the UC's car.

14.     Approximately 25 minutes later, the UC texted AMADOR at 332-201-8354, telling AMADOR that he was "Mike," the person who had just purchased drugs from AMADOR on Myrtle Street. Minute later, AMADOR responded, "ok." The UC understood this to mean he was to contact this telephone number in the future to place a heroin and or fentanyl order with AMADOR.

<u>July 25, 2019: AMADOR sold 11 grams of suspected fentanyl to an undercover officer</u>

15.     At approximately 1:00pm on July 25, 2019 the UC text messaged AMADOR at 332-201-8354 to arrange for the purchase of 10 grams of fentanyl and a free sample. AMADOR responded "Ok" and instructed the UC to meet him in Lawrence, MA. (The text messages to and

from AMADOR are in Spanish.  Drafting and translation of the text messages were performed

by a Spanish-speaking Task Force Officer.)  The UC attempted to identify a specific location in

Lawrence, MA, but did not immediately receive a response from AMADOR.

16.     At approximately 1:38pm, the UC received two calls from the phone number 978-

943-8970, which the UC did not answer.  At 1:40pm that same number (978-943-8970) sent the

UC a text message, informing the UC that his cellular phone had run out of battery and

instructing the UC to meet him near 12 Melrose Street in Lawrence.

17.     At approximately 1:58pm, the UC drove to the area of 12 Melrose Street in

Lawrence and a surveillance team did the same.  The UC notified AMADOR, by text message to

(978) 943-8970, that he had arrived and at 2:00pm the UC received a response, "1 sec."

18.     Moments later, AMADOR—the same man who had sold five grams of fentanyl to

the UC on July 16—and another man approached the UC's car, walking from direction of Water

Street.  AMADOR and the other man ("PERSON 2") were scanning the street, looking in all

directions. They stopped approximately five feet behind the UC's car, standing up against

building and leaning to look into the UC's car.

19.     AMADOR then approached the passenger side of vehicle.  PERSON 2 remained

a short distance from the car, but leaned over and looked into the rear window of the UC's

vehicle.

20.     AMADOR leaned into the passenger side window of the UC's car and asked

"complete?"  Based on his training and experience, the UC understood AMADOR to be asking

whether he had all the money.  The UC said yes and handed AMADOR $400.00 in OAF.

AMADOR handed seven bags of an off-white powdery substance to the UC.  Six bags contained

approximately one gram each of the off off-white, smooth powdery substance (i.e., not granular

or sandy).  The seventh bag contained approximately five grams of the off-white, smooth

powdery substance (i.e., not granular or sandy).  Based upon the UC's training and experience,

the packaging, appearance, and pricing, the UC believes that the substance provided by

AMADOR contains fentanyl.

21.     The UC drove away from the scene.  AMADOR walked away from car, returning

to PERSON 2 and together they walked in the direction of 34 Melrose Street.

22.     As AMADOR and PERSON 2 were walking away, law enforcement officers

approached, displaying their badges, and ordered both men to stop.  AMADOR complied.

PERSON 2 ran in the direction of 34 Melrose Street—the Target Location.

23.     AMADOR was detained and searched.  AMADOR was in possession of a

Dominican Republic identification card, on which was a picture that matched AMADOR.  Using

this identification card, law enforcement officers were able to identify AMADOR.  While

searching AMADOR's person, officers found a small plastic twisted bag of a white powdery

substance.  Based upon his training and experience, the packaging and appearance, the UC

believes that that substance contains fentanyl.  AMADOR also had in his pocket the OAF that

the UC had handed to AMADOR.

24.     Meanwhile, PERSON 2 ran into driveway of 34 Melrose Street—the Target

Location.  He reached the front door of the Target Location and used a key to open the door.

Before he could enter the house, officers made contact with PERSON 2 and detained him.

Officers asked PERSON 2 if he lived at 34 Melrose Street.  He answered that he did not, saying

that he lived on Basswood Street.

25.     Shortly after PERSON 2 was detained, an individual came out of the house

located at 36 Melrose Street ("NEIGHBOR").  NEIGHBOR indicated that he/she lives at 36

Melrose Street and manages 34 Melrose Street. NEIGHBOR told officers that PERSON 2 rented the house for $250 per week. NEIGHBOR told the officers that PERSON 2 typically paid his rent in cash and that he had been living at 34 Melrose Street for two to three months. NEIGHBOR said that he/she did not know AMADOR, and also said that PERSON 2 is not supposed to allow others to have access to the house.

26.     Officers secured the house at 34 Melrose Street and remain at that location.

27.     34 Melrose Street is a single family residence. It shares a porch with 36 Melrose Street, where NEIGHBOR says he/she lives.

28.     Officers removed handcuffs from PERSON 2 and told him that they would execute a search warrant on the Target Location and that he was free to leave. Officers then asked PERSON 2 for his phone number, and PERSON 2 answered that it was 978-943-8970— the same number with which the UC had exchanged text messages earlier that afternoon to set up the sale of drugs after AMADOR's mobile phone had run out of battery. (Officers never advised PERSON 2 of his *Miranda* rights.)

29.     Based on my training and experience, I believe PERSON 2 ran to the Target Location and that PERSON 2 attempted to enter the Target Location because the Target Location is used in connection with the distribution of controlled substances. This belief is reinforced by the fact that PERSON 2 was not truthful about the fact that the lives at the Target Location.

## Drug Traffickers' Use of Residences and Cell Phones Generally

30.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence are frequently recovered during searches of drug-traffickers' residences and locations of operation:

    a.   Controlled substances.

    b.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

    c.   Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

    d.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

    e.   Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

    f.   Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

h. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

i. Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

31.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

32.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts.

33.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

34.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

35.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

36.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution possession with intent to distribute and distribution of controlled substances, including fentanyl. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

37.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of

communication, drug dealers typically keep the phones in close proximity or at their residences.

Additionally, in my experience, many drug dealers do not dispose of their cellular telephones

when getting a new number, but instead just discard them in various locations in their residences.

As a result, it is common to recover not only paper records pertaining to the use of a cellular

phone by drug dealers, such as bills, call detail records, statements, and other documents, but the

cellular telephones themselves, from drug dealers' residences.

38.     Based upon my knowledge, training and experience, I know that a cellular

telephone is a handheld wireless device used primarily for voice communication through radio

signals.  These telephones send signals through networks of transmitter/receivers called "cells,"

enabling communication with other wireless telephones or traditional "land line" telephones.  A

wireless telephone usually contains a "call log," which records the telephone number, date, and

time of calls made to and from the phone.  In addition to enabling voice communications,

wireless telephones now offer a broad range of capabilities.  These capabilities include, but are

not limited to: storing names and phone numbers in electronic "address books;" sending,

receiving, and storing text messages and email; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments,

and other information on personal calendars; and accessing and downloading information from

the Internet.  Wireless telephones may also include global positioning system ("GPS")

technology for determining the location of the device.  Based on my training and experience, I

know that many cellular telephones have the capabilities described above.

39.     Seizure of devices containing this information will provide information relating to

coconspirators and accomplices.  I know, based upon my training and experience, as well as

consultation with other investigators, that individuals who sell illegal drugs typically use cellular

telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

40.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

41.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

42.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B, will be found in the Target Location, described in Attachments A.

## CONCLUSION

43.    Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at the Target Location, as described in Attachment A, there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachment B.  Accordingly, I respectfully request that search warrants be issued authorizing the searches of the Target Location described in Attachments A for the items detailed in Attachment B.

44.    Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that on or about July 25, 2019, Erick Alberto Paulino AMADOR distributed and possessed with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Accordingly, I respectfully request that a criminal complaint charging Erick Alberto Paulino AMADOR, a/k/a "FLACO," with violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) be issued.

45.    Execution of this search warrant is necessary at any time of day or night because officers are currently securing the Target Location.

James Keczkemethy
DEA Special Agent

SIGNED and SWORN to before me this day, July 25, 2019.

HONORABLE JENNIFER C. BOAL
United States Magistrate Judge
District of Massachusetts

15

## ATTACHMENT A
### (Location to be searched)

### 34 MELROSE STREET, LAWRENCE, MASSACHUSETTS

The property at 34 Melrose Street, Lawrence, Massachusetts is a single family home. It has wide

siding and a brown door. The number 34 is affixed to the siding to the left of the stairs that lead

to the door.







**ATTACHMENT B**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses") from January 2019 to present:

1.  Controlled substances, including fentanyl.

2.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7.     Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8.     Cellular telephones used by or belonging to Erick Alberto Paulino AMADOR or the individual who uses telephone number 978-943-8970, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a.     Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b.     Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.     Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d.     Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e.     GPS data;

   f.     Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g.     Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.   Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**Note: The government's authorization to seize the documents and records described above is limited to records from January 1, 2019 through the date of execution of the warrant.**

### RETURN OF SEIZED PHONES

If the owner of any seized cellular phone requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized phone, the government determines that the phone does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the phone will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If the phone cannot be returned, agents will make available to the phone's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all phones seized pursuant to this warrant for as long as is necessary for authentication purposes.